801 F.2d 451
 255 U.S.App.D.C. 237, 33 Cont.Cas.Fed. (CCH) 74,572,
2 UCC Rep.Serv.2d 151
 GATOIL (U.S.A.), INC., Appellant,
v.
WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY.
W.A. BENSON, d/b/a Benson and Associates, Appellant,
v.
WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY.
 Nos. 85-5740, 85-5741.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued March 14, 1986.
Decided Sept. 9, 1986.
As Amended Sept. 16, 1986.
 
 Appeals from the United States District Court for the District of Columbia (Civil Action No. 84-3240).
 Bruno A. Ristau, Washington, D.C., for appellants.
 Donald N. Rothman and Lawrence S. Greenwald, Baltimore, Md., were on brief, for appellant Gatoil (U.S.A.), Inc. in No. 85-5740. Robert W. Katz, Baltimore, Md., also entered an appearance for appellant Gatoil (U.S.A.), Inc. in No. 85-5740.
 Jacob Dweck, Washington, D.C., was on brief, for appellant W.A. Benson in No. 85-5741. Beverly J. Rudy, Washington, D.C., also entered an appearance for appellant W.A. Benson in No. 85-5741.
 Thomas B. Dorrier, with whom Sara E. Lister and Robert L. Polk, Washington, D.C., were on brief, for appellee in Nos. 85-5740 and 85-5741.
 Before EDWARDS, SCALIA and BUCKLEY, Circuit Judges.
 Opinion for the Court filed by Circuit Judge SCALIA.
 SCALIA, Circuit Judge:
 
 
 1
 Gatoil (U.S.A.), Inc. and W.A. Benson, appellants in these consolidated cases, appeal from a decision by the United States District Court for the District of Columbia denying their motions for summary judgment and granting the summary judgment motion of appellee Washington Metropolitan Area Transit Authority ("WMATA"). The District Court granted summary judgment to WMATA on the ground that Benson and Associates ("B & A"), a joint venture formed by appellants, broke its contract to supply WMATA with diesel fuel by failing to make a good-faith effort to secure a performance bond that was a condition precedent to the contract. The principal issues presented are whether the District Court measured B & A's duty of good faith by the proper standard; whether WMATA is entitled to summary judgment on that issue when the proper standard is applied; and whether the District Court erroneously denied Benson's motion for summary judgment.
 
 
 2
 * Briefly summarized, the undisputed facts relevant to this appeal are as follows.[1] In April of 1983, WMATA solicited bids on a contract to supply its annual diesel fuel requirement. B & A was the low bidder, and in May of 1983 WMATA and B & A held a pre-award meeting at which B & A agreed to the requirement of a performance bond as a means of guaranteeing its performance. Gatoil thereafter sought to obtain a bond from the firm of Marsh & McLennan. On June 21, however, before the contract between WMATA and B & A was executed, Gatoil sent a letter informing B & A that Gatoil would be unable to supply the fuel that B & A had intended to sell to WMATA. Nevertheless, the contract was executed on June 24, and the understanding regarding a performance bond was reflected in paragraph five of the contract, which provided that "[e]ffectivity of this contract is contingent upon the submittal of a performance bond in the amount of 15% of the entire bid.... This bond must be received prior to June 30, 1983." On the same day that the contract was executed, Marsh & McLennan sent a letter informing Gatoil that it would be unable to supply B & A with a bond in the absence of a bank letter of credit or indemnification from Gatoil's parent company. Gatoil made no further effort to obtain a bond, asserting that it was financially unable to obtain a letter of credit. Also on June 24, WMATA sent a letter to B & A stating in relevant part:
 
 
 3
 It has come to the Authority's attention that Special Condition No. 5 on the above referenced contract requiring a performance bond prior to June 30, 1983, is hereby revised. [sic] In the interest of satisfactorily proceeding with this contract, the date of the Bond submittal is extended to July 15, 1983. Delivery of fuel will not commence until the performance bond is received by the Authority.
 
 
 4
 Defendant's Request for Admission, Exh. C. Four days later, WMATA sent another letter, which purported to be a limited contractual authorization of delivery between July 1 and the earlier of July 15 and the date upon which WMATA received an acceptable bond. The letter concluded: "Upon receipt of an acceptable performance bond, [the contract] will supersede this limited letter of authorization for the delivery of diesel fuel and all terms and conditions of said contract will then be in effect. Acceptance of the bond will be in the form of a written letter." Id., Exh. D. The next day, on June 29, B & A for the first time informed WMATA that it was having difficulty obtaining a supplier of fuel and that it would be unable to begin deliveries on July 1.
 
 
 5
 No performance bond had been provided by June 30, and on that day B & A indicated to WMATA that it was trying to find another supplier of fuel and hoped to do so by July 5. On July 1, WMATA sent a final letter to B & A, which read in relevant part as follows:
 
 
 6
 Please refer to [the contract] and my letters dated June 24, 1983 and June 28, 1983. In reviewing those documents, we noted an element of confusion generated by the inadvertent inclusion in [the contract] of [paragraph five, which established the performance bond as a condition precedent].
 
 
 7
 My letter dated June 24, 1983, extended the date for bond submittal to July 15, 1983. In my June 28, 1983 letter I authorized delivery to commence on July 1, 1983. Please be advised that [paragraph five] contains an error. Therefore, paragraph 5 is revised to read as follows:
 
 
 8
 5. This contract shall become, and is, effective as of June 9, 1983. Performance shall commence on July 1, 1983 and shall continue through June 30, 1984. Benson and Associates shall furnish a performance bond in the amount of 15% of the entire bid ... on or before July 15, 1983, in default of which WMATA shall have the right at its sole option to terminate the contract and pursue the remedies provided under the contract and/or under applicable law.
 
 
 9
 My June 24, 1983 and June 28, 1983 letters are revised accordingly.
 
 
 10
 In view of the confusion generated by the above, I am establishing July 11, 1983 as the date for commencement of deliveries under the contract. Please advise no later than July 5, 1983 if you are unable to begin delivery on July 11, 1983 and, if you are unable to commence delivery on that date, the date on which delivery can begin. We expect to receive your bond on or before July 15, 1983 absent advice from you to the contrary.
 
 
 11
 Id., Exh. E. On July 5, B & A replied by mailgram: "Please accept this letter as our formal notice that we cannot accept your unilateral attempt to change the contract as agreed to and executed by both parties on June 24, 1983. If I can be of any further service to you in this regard I remain at your disposal." Id., Exh. F.
 
 
 12
 No further communications took place between the parties and WMATA arranged to obtain diesel fuel elsewhere. On October 22, 1984, WMATA filed this breach of contract action in the District Court, pursuant to Sec. 81 of Pub.L. No. 89-774, 80 Stat. 1324, 1350 (1966), seeking to recover the difference between the price it finally paid for its diesel-fuel requirements and what it would have paid under the contract with B & A.
 
 
 13
 The parties filed cross-motions for summary judgment, and the District Court granted WMATA's motion, holding that B & A had failed in its duty to make a good-faith effort to secure a performance bond. WMATA v. Gatoil (U.S.A.), Inc., 607 F.Supp. 1422 (D.D.C.1985). Benson and Gatoil filed motions to amend the judgment and, after those motions were denied in relevant part, filed separate appeals, which have been consolidated.
 
 II
 
 14
 We begin by considering Benson's challenges to the District Court's denial of his motion for summary judgment.[2] Relying on what he takes to have been the holding of the District Court that WMATA had unilaterally extended the period for obtaining the bond through July 15, Benson first argues that WMATA anticipatorily broke the contract by contracting for fuel elsewhere before that date. This argument rests upon a misunderstanding of the District Court's opinion, which reached no conclusion about the effect of WMATA's efforts to extend the period for submission of the bond. Rather, the District Court merely drew an adverse inference about B & A's good faith from the fact that, although "WMATA, the beneficiary of the condition precedent and thus the party with a right to waive or excuse its nonperformance, was eager to go ahead with the contract and willing temporarily to waive performance of the condition[,] [B & A] seized on this as an attempt to modify the contract and rejected it out of hand...." WMATA v. Gatoil (U.S.A.), Inc., 607 F.Supp. at 1425. The District Court did not hold that WMATA's correspondence with B & A was actually effective in extending the period for fulfillment of the condition precedent--nor could it properly have held so. It is true that WMATA, as the beneficiary of the condition precedent, had the power to excuse its failure, see RESTATEMENT (SECOND) OF CONTRACTS Sec. 226 comment a, illustration 4 (1981), but that is not what it did. Its June 24 letter merely extended the period for fulfillment of the condition precedent. Such an extension, unlike a complete waiver, is not without burdens for the other party, and thus cannot be achieved unilaterally. (In the present case, for example, it might have been of critical importance to B & A to know by July 1 and no later whether it would be bound to the WMATA contract.)
 
 
 15
 Nor, under these facts, does it appear possible to treat WMATA's announcement of an extension as an offer to amend the contract that was implicitly accepted by B & A's course of conduct. Before any significant conduct by B & A occurred, the "offer" had been twice revised and in its final form (which no longer extended the time limit but rather converted the condition precedent into a contractual obligation) was categorically rejected by B & A's mailgram of July 5. Since B & A never accepted these proposed modifications, the period within which the condition precedent was required to occur was not extended. Thus, as of June 30, 1983, B & A's failure to secure a performance bond rendered its contract with WMATA ineffective. The only remaining questions are whether B & A failed to make a good-faith effort to secure the bond, and, if not, whether it can be held liable for that failure.
 
 
 16
 Benson also argues that the contract between B & A and WMATA was a requirements contract under which B & A could not be liable for a failure to deliver fuel until WMATA issued purchase orders requesting delivery, whereupon its liability would be limited to the particular orders not filled (citing Sparhawk v. United States, 134 F. 720 (3d Cir.1905); Tennessee Soap Co. v. United States, 126 F.Supp. 439 (Ct.Cl.1954)). Since no such orders were ever issued, Benson asserts that B & A is not liable even if it did not make a good-faith effort to secure a performance bond. We agree with the District Court that this argument lacks merit. Whatever the rule may have been in the days when courts viewed requirements contracts askance because of their perceived lack of mutuality, it seems clear that, under the Uniform Commercial Code as adopted in the District of Columbia,[3] a seller of goods who anticipatorily repudiates the entirety of his obligations under a requirements contract can be held liable for the difference between the cost to the buyer of substitute goods and the contract price. See D.C.CODE ANN. Secs. 28:2-306(1), 28:2-610, 28:2-711, 28:2-712 (1981). We cannot imagine that the rule could be any different with respect to a seller who, as B & A is alleged to have done in this case, violates his duty to exercise good faith in attempting to secure the fulfillment of a condition precedent to a requirements contract, thereby preventing the underlying contract from coming into effect. Cf. RESTATEMENT (SECOND) OF CONTRACTS Sec. 225, and comment d, illustration 8.
 
 
 17
 Finally, Benson appears to argue in his brief that WMATA is precluded from recovering damages from B & A because it failed to abide by various contractual provisions requiring it to give B & A written notice before terminating the contract or contracting for an alternative supply of fuel. Counsel for Benson conceded at oral argument, however, that if the contract never came into effect because the condition precedent did not occur, then these contractual notice provisions never became operative. Until the condition precedent was fulfilled, neither B & A nor WMATA had any duties under the contract--except, of course, B & A's duty to seek, and WMATA's duty not to impede, fulfillment of the condition precedent (which may analytically be regarded as duties under a separate, "precontract" contract, cf. Heyer Products Co. v. United States, 140 F.Supp. 409 (Ct.Cl.1956)). We therefore conclude that the District Court properly denied Benson's motion for summary judgment.
 
 III
 
 18
 Appellants also contend that the District Court erred in holding, on summary judgment, that B & A had broken its obligation to make a good-faith effort to obtain a performance bond. It is undisputed that submission of a performance bond was a condition precedent to the contract; that, since the occurrence of that condition precedent was in B & A's power, B & A had a duty to exercise good faith in trying to obtain the bond; and that the contract was governed by District of Columbia law. Gatoil contended before the District Court that B & A's good faith should be measured against the standard imposed by the U.C.C., as adopted in the District of Columbia, D.C.CODE ANN. Sec. 28:1-203 (1981), which, in the case of a merchant,[4] required "honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade." Id. Sec. 28:2-103(1)(b). The District Court, however, remarking that it had found no cases in the District of Columbia defining the duty of good faith and that Maryland had "a substantial interest in the case," measured B & A's good faith against the general principles of Maryland contract law. WMATA v. Gatoil (U.S.A.), Inc., 607 F.Supp. at 1424 n. 6. Under those principles, the District Court held, B & A's duty of good faith was the duty to "make reasonable efforts." Id. at 1424 (citing Bushmiller v. Schiller, 35 Md.App. 1, 368 A.2d 1044, 1048 (Md.Ct.Spec.App.1977)). Finding that the record before it required the conclusion that B & A did not make a reasonable effort to obtain a performance bond, the District Court granted summary judgment to WMATA.
 
 
 19
 Gatoil argues that the District Court's reliance upon the Maryland standard was erroneous and that, when the U.C.C. standard is applied to the record before the District Court, summary judgment is inappropriate. We agree on both counts. As we have already noted, the present contract is governed by the U.C.C. See note 3 supra. And in its current state, the record simply does not require the finding (as summary judgment demands) that B & A failed to act with "honesty in fact" or to observe "standards of fair dealing in the trade." As to B & A's honesty in fact, disputes as to parties' subjective mental states are notoriously difficult to resolve on motion for summary judgment, see, e.g., Mazaleski v. Treusdell, 562 F.2d 701, 717 (D.C.Cir.1977). This case is no exception. Viewing the record in the light most favorable to B & A and making all inferences in B & A's favor, see, e.g., United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 994, (1962), one could reasonably conclude that B & A made an effort to secure a performance bond; that it was told it could not obtain a bond without a bank letter of credit or indemnification by its parent corporation, which had substantial assets; that it was financially unable to secure a letter of credit and unwilling to seek indemnification; that, having made what it believed to be a good-faith effort to obtain a bond, it abandoned further efforts without conveying that fact to WMATA; that, although it was having difficulty obtaining a supplier of the fuel it needed to perform under the contract, and had told WMATA that it would be unable to supply fuel on July 1 as agreed, it was making efforts to secure a supplier up to the time at which the contract failed because the time for occurrence of the condition precedent had passed; and that, although it refused to agree to WMATA's offers temporarily to extend the period within which the condition precedent could occur, it did so because (in addition to the new substantive terms attached to those offers) it had no reason to believe that the extension would enable it to obtain the performance bond, and anticipated that WMATA might waive the condition entirely. We do not believe that the record, viewed in a light favorable to B & A, requires the conclusion that B & A did not act with honesty in fact. As to B & A's observance of "standards of fair dealing in the trade," in the absence of any evidence regarding standards governing the procurement of performance bonds in the relevant trade--and, more specifically, whether parent corporations are normally expected to stand as indemnitors for their subsidiaries--we are unable to conclude from this record that B & A's efforts did not measure up. Cf. First National Bank, Martinsville v. Crone, 157 Ind.App. 665, 301 N.E.2d 378, 381 (Ind.Ct.App.1973).
 
 
 20
 WMATA also appears to contend that B & A's communications to WMATA detailing its difficulties in obtaining a supplier of fuel must be regarded as an anticipatory breach of the contract. Assuming that this argument has been properly preserved (it was not advanced as an independent basis for summary judgment in the District Court), it must be rejected. Viewed in a light favorable to B & A, the record of events up to June 30 (the date on which the contract became a nullity because of the failure of the condition precedent) establishes only that on June 29 B & A informed WMATA that it was having trouble obtaining fuel, that it would be unable to begin deliveries on July 1 as had previously been agreed, and that it was seeking alternative sources of supply and hoped to secure one by July 5. These facts simply do not require, or indeed even permit, as D.C. law requires, the conclusion that B & A "unequivocally and positively" repudiated its obligation to perform under the contract. Order of AHEPA v. Travel Consultants, Inc., 367 A.2d 119, 125 (D.C.1976); see generally D.C.CODE ANN. Sec. 28:2-610 (1981).
 
 
 21
 We therefore conclude that the District Court's grant of summary judgment to WMATA was erroneous.
 
 
 22
 * * *
 
 
 23
 * * *
 
 
 24
 The judgment of the District Court is affirmed in part and reversed in part, and the cases are remanded for further proceedings consistent with this opinion.
 
 
 
 [1]
 On appeal, WMATA and Gatoil each contends that certain of the facts found by the District Court to be undisputed rest upon affidavits or answers to interrogatories that were improperly sworn in violation of Fed.R.Civ.P. 56. WMATA made its argument for the first time on appeal, and Gatoil made its argument for the first time in a postjudgment motion before the District Court. Because no exceptional circumstances exist to justify the parties' failure to assert these arguments in a timely fashion, we do not consider them here. See, e.g., District of Columbia v. Air Florida, Inc., 750 F.2d 1077, 1084-85 (D.C.Cir.1984)
 
 
 [2]
 Although Gatoil apparently does not seek reversal of the denial of its motion for summary judgment, it renews one argument that it made for the first time in support of its postjudgment motion that the District Court reconsider that denial, i.e., that it cannot be held liable for any breach of B & A's contract with WMATA because it did not agree to that contract. Because no exceptional circumstances excuse Gatoil's failure to raise this argument before the District Court in a timely fashion, we do not consider it here. See, e.g., District of Columbia v. Air Florida, Inc., 750 F.2d at 1084-85
 
 
 [3]
 We think it apparent that the present contract is governed by the provisions of the U.C.C. as adopted in the District of Columbia, since it clearly involved a "transaction[ ] in goods," D.C.CODE ANN. Secs. 28:2-102, 28:2-105(1) (1981), "bearing an appropriate relation to the District [of Columbia]," id. Sec. 28:1-105(1)
 
 
 [4]
 We think it clear, and the parties do not dispute, that this was a transaction between merchants within the meaning of D.C.CODE ANN. Sec. 28:2-104(1), (3) (1981)